**INDEPENDENT NEWS CO., Inc., National Comics Publications, Inc., Superman, Inc., Appellants,**

v.

**Harry WILLIAMS.**

**No. 13440.**

United States Court of Appeals Third Circuit.

Argued March 9, 1961.

Decided June 6, 1961.

---

8. 12 U.S.C.A. § 1743(f).

9. 12 U.S.C.A. § 1713(k).

10. 12 U.S.C.A. § 1713(l).

11. 12 U.S.C.A. § 1743(c).

Alexander N. Rubin, Jr., Philadelphia, Pa. (Goff & Rubin, Philadelphia, Pa., on the brief), for appellants.

William R. Pomerantz, Philadelphia, Pa., for appellee.

Before GOODRICH, McLAUGHLIN and FORMAN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Can a second-hand periodical dealer who purchases cover-removed comics from waste paper dealers be enjoined under any one of six different legal theories, from marketing them as reading material? The district court refused to grant an injunction, holding that defendant's actions did not constitute conversion of the literary property in the comics, trademark infringement, copyright infringement, unfair competition, sales in violation of the legend appearing on each magazine or an invasion of the right of privacy.

Plaintiff, Independent News Co., Inc., is the distributor of the comics; plaintiff, National Comics Publications, Inc., is the publisher; plaintiff, Superman, Inc., owns the copyright and trademark. The defendant, Harry Williams, is a Philadelphia distributor of second-hand books and magazines.

The critical facts involve the distribution system used in marketing the comics. The distributor, Independent, pursuant to a written contract, sells the comics to the wholesaler. The comics are to be offered for sale during a period specified by the publisher. The wholesaler then sells them to the various retail outlets with the same restriction. At the end of the sales period, the wholesaler reacquires from the retail outlets all unsold comics and gives the retailer full credit. In turn the wholesaler is entitled to full credit from Independent. However, instead of returning the entire comic, the agreement provides that unless otherwise directed, the wholesaler need only return the cov-

ers. As to the remaining portion of the comic, the wholesaler is obligated to, " * * * destroy or mutilate the remaining portions thereof so as to render them unsalable as publications." He further agrees, " * * * that such destroyed or mutilated portions of return copies shall be disposed of or sold for no other purpose than waste paper, and *that he will obtain a written commitment from the purchasers of such destroyed or mutilated return copies that the same will be used only for waste and will not be resold.*" (Emphasis supplied.)

In the case at bar the district court found as a fact that the defendant had purchased cover-removed comics from waste paper dealers and then sold them on the open market; that although the contract between Independent and the wholesalers required that the wholesaler obtain a written commitment from the waste paper dealers, no such commitment was ever obtained; and that: "There is no evidence that the defendant had any knowledge that any of the wastepaper dealers from whom he purchased were obligated to sell their coverless comics as wastepaper only." [184 F.Supp. 879.]

The first proposition upon which plaintiffs rely is conversion. They argue that after the covers of the comics are removed and returned to Independent for full credit, title to the insides of the magazines as "literary works" reverts to Independent. Primary reliance is placed upon the terms of the contract between Independent and the wholesaler, which provides:

"Except as hereinafter provided, returns shall consist of top parts of front covers showing dates of issues, but before Wholesaler shall become entitled to credit for returns of unsold copies, Wholesaler must recover such copies whole, and after detaching front covers thereof shall destroy or mutilate the remaining portions thereof so as to render them unsalable as publications. Wholesaler agrees that such destroyed or muti-

lated portions of return copies shall be disposed of or sold for no other purpose than waste paper, and that he will obtain a written commitment from the purchasers of such destroyed or mutilated return copies that the same will be used only for waste and will not be resold.

\* \* \* \* \* \*

"Title to all copies from which covers have been detached as above provided shall remain with the Company until the same are so destroyed or mutilated as to be unusable for any purpose except waste. The use of such copies for any purpose other than waste is unauthorized and contravenes this agreement."

Elaborating upon these provisions plaintiffs contend that once the wholesaler returns the covers to Independent for credit, " * * * the Wholesaler becomes the agent of the distributor for the sole and exclusive purpose of mutilating the periodical and disposing of it under specified limitations." From this, plaintiffs conclude that since the wholesaler only has limited authority to dispose of the comics as waste, he cannot transfer title to the "comics" as "literary works" to either the waste paper dealer or the defendant.

The district court rejected this argument and expressly found that the reservation of title in the contract had no effect upon the waste paper dealer who was a buyer in the ordinary course of business; the whole agreement between the parties was "at best, a sale or return transaction,"; no agency relationship ever arose; and the waste paper dealer and in turn the defendant acquired the full complement of property rights in the comics.

Under the Uniform Commercial Code, adopted in Pennsylvania, Section 2–403 (2), 12A Purdon's Stat. § 2–403(2) (1959), provides

"(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of

the entruster to a buyer in ordinary course of business."

That section of the Code has broadened the protection of buyers in the ordinary course of business, and has changed prior Pennsylvania law. The Pennsylvania Bar Association Notes in 12A Purdon's Stat. § 2–403(2) (1954) state:

"(2) Delivery to a Merchant Who Deals. Where an owner delivers goods to a merchant who wrongfully resells, subsection (2) of the Code would also give more protection to purchasers than prior laws. Thus, under the Code, the owner's loss of title does not depend on his having conferred on the merchant any authority to deal with the goods. No holding found in this state would go so far as to allow resale to cut off the owner's title of a watch left with a jeweler for repair or a car left with a garage for repair or storage. Contrary to the Code, see Restatement of Agency, §§ 174, 200 and Pennsylvania Annotations. The nearest support is a dictum in Rapp v. Palmer, 3 Watts 178, 180 (1834); but see Commercial Motors Mfg. Corp. v. Waters, 280 Pa. 177, 124 Atl. 327 (1824) (dictum contra)."

And as has been stated by one of the commentators on the Code:

"Under subsection 2–403(2) an owner's loss of title does not depend on his having conferred on the merchant any authority to sell the goods. His entrustment of goods to a merchant who deals in goods of that kind alone gives the merchant the power to transfer all the rights of the entruster to a buyer in the ordinary course of business. * * * Subsection 2–403(2) comes very close to adopting the doctrine of market overt, an English and Continental European doctrine protecting good faith purchasers who have bought goods in the open market. The subsection recognizes the commercial desirability of increasing the marketability of goods, and this recognition is implemented by saying, in effect, to buyers in ordinary course of business that your purchase gives you all the interest in the goods that the merchant has by the power to transfer (2–403(1)), plus all the interest the person had who entrusted the possession of the goods to the merchant." Hawkland, Sales and Bulk Sales Under the Uniform Commercial Code 105 (1958)."

In the case at bar, plaintiffs " * * * conceded that plaintiffs have 'entrusted' the magazines in question to the Wholesaler-Agent." However, they dispute the applicability of Section 2–403(2) stating:

"(a) Wholesaler-Agent is not a 'merchant who deals in goods of that kind * * *' and

"(b) neither the waste paper house nor the defendant is a 'buyer in the ordinary course of business' as defined by the Code."

The first assertion seeks to distinguish between the wholesaler " * * * selling new publications prior to or during the publication period," and the wholesaler selling the cover-removed magazines. The argument is specious. The wholesaler deals in comics, and the fact that the covers are present or not is irrelevant. His regular business is dealing with comics and as such he is a "merchant who deals in goods of that kind."

The interrelated second contention, namely, that neither the waste paper dealer nor the defendant are buyers in the ordinary course of business is equally without merit. In defining this concept, Section 1–201(9) of the Code, 12A Purdon's Stat. § 1–201(9) (1959), provides:

"(9) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind * * *."

The district court's finding of fact forms a proper basis for the determination that the waste paper dealer is within

that definition. Finding Number 8, states:

"8. There is no evidence that any of the wastepaper dealers from whom the defendant purchased coverless comics had, in fact, any contractual obligation to use such comics as wastepaper only."

And there is no evidence in the record, apart from this finding, that shows that the waste paper dealers had any notice of any restriction whatsoever on the cover-removed comics purchased from the wholesaler. It follows, that when the wholesaler sold these coverless comics to the waste paper dealer, the waste paper dealer, under Section 2–403(2) of the Code, obtained the totality of property rights in the comics, which included the right to use or sell them as reading material.[1]

■ The second theory urged by the plaintiffs is trademark infringement. As to this the district court's conclusion of law number 5 held:

"5. The plaintiff's trademarks protect plaintiffs from any attempt of a third person to induce the public to believe that periodicals created and sold by that third person were created by plaintiffs. Plaintiffs' trademarks do not in any way prevent the sale by the defendant of comics originally published bearing plaintiffs' trademark, either with or

without covers. 52 Am.Jur. §§ 83, 120."

Plaintiffs in their brief concede:

"There is no doubt that the plaintiffs' trademarks do not prevent the sale of the magazines by the defendant. As a matter of fact, a trademark owner may not entirely prevent another from selling his product under the trademark even though it has been repackaged. Any doubt along these lines was resolved by the leading case of Prestonettes, Inc. v. Coty, 264 U.S. 359 [44 S.Ct. 350, 68 L.Ed. 731] (1924). The Supreme Court in that case held that the repackager could sell the trademarked product of the plaintiff as long as the label clearly stated that the product had been repackaged and by whom."

Nevertheless, they argue the narrow point that defendant's marketing of coverless comics, constitutes trademark infringement because the coverless comics are " * * * in a mutilated or adulterated state, * * * " citing R. B. Semler, Inc. v. Kirk, D.C.E.D.Pa.1938, 27 F.Supp. 630 and Bayer Co. v. Sumner Printing Co., D.C.N.D.Ohio 1934, 7 F.Supp. 740. Continuing, plaintiffs state:

"The theory of these cases is that the defendant may not utilize the plaintiffs' trademark to sell a product unless it is identical in every respect to the original product as

1. Plaintiffs have cited the group of decisions in the Sperry-Hutchinson case to support their contention. Sperry & Hutchinson Co. v. Mechanics' Clothing Co., C.C.D.R.I.1904, 128 F. 800; C.C. D.R.I.1904, 128 F. 1015; C.C.D.R.I. 1904, 135 F. 833. In that case, the plaintiff sought to enjoin the defendant from using defendant's green stamps for promotional purposes. The defendant had acquired the stamps from both merchants and consumers. The district court allowed the injunction, holding that although the defendant acquired title to the stamps to be used for *redemption*, the defendant did not acquire title to the stamps to use them for *promotional purposes*. By analogy, plaintiffs argue the principle of those decisions is applicable to the case

at bar. Factually they are radically different. As stated by the court in that case:

"A trading stamp is not ordinary property. It is sui generis. It represents a somewhat complicated transaction, and, from its nature, I think there are necessary limitations upon the modes in which it may be transferred." 135 F. at page 834.

The comic books before us are not of such a peculiar nature and character.

To the extent that the case of Yachting Publishing Corporation v. Friedman, 1958, 15 Misc.2d 810, 182 N.Y.S.2d 664, decided under New York law is in conflict with our decision, we deem it inapplicable.

marketed by plaintiffs. If it is adulterated or altered in any way, such sales infringe the plaintiffs' trademark rights. Such action damages the plaintiffs' good will and causes confusion and deception in the minds of the public."

In Semler [27 F.Supp. 632], the court issued an injunction prohibiting defendant from rebottling Kreml hair tonic, holding that because of the peculiar nature of the product, and the disproportion of the ingredients caused by the rebottling process, " * * * the resulting product is not Kreml but at best but a distortion of it." In Bayer, the court rested the granting of the injunction prohibiting the defendant from repackaging aspirins on the firm ground that there was public deception, stating at page 742 of 7 F.Supp.:

"The defendants do market the product of the plaintiff so as to give the impression to the public that the plaintiff sponsors the defendants' sale in packages of two, whereas no such method has been in use by the plaintiff. To that extent, such sale is deceptive; and the use of the plaintiff's trade-mark on identical display cards as those used by the plaintiff is calculated to lead the public to believe that the product as thus marketed by the defendants is the plaintiff's."

These decisions are not in point here. The defendant does not in any way change or alter the form, contents or appearance of the comics so as to come within the rationale of cases like Semler and Bayer. See Restatement of Torts § 737 (1938). Nor does the defendant do any act with respect to the trademarked article which causes public deception as is prohibited by the general doctrines of trademark infringement. See Prestonettes, Inc. v. Coty, 1924, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731; Champion Spark

Plug Co. v. Sanders, 1947, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386. He merely resells the comics in the identical form in which he purchases them. Cf. Restatement of Torts § 736 (1934). Any change of appearance or alteration of the comics is caused by plaintiffs. According to their own testimony, they require the wholesaler to remove the covers. They cannot now allege as the basis of an allegation of trademark infringement, the alterations that they themselves have caused.[2]

Plaintiffs' third theory is copyright infringement. They allege that under the Copyright Act, as amended 17 U.S.C.A. § 1 et seq., one of the rights granted a copyright holder is the exclusive right to "vend", the copyrighted work. Factually they contend that: "In the instant case defendant buys, not the literary work at the price specified by the owner of a copyright, but instead buys scrap paper at a small fraction of a cent per copy. He then turns around and makes the *first sale* of this periodical *as a literary work.*"

This argument is completely refuted by the holding in Harrison v. Maynard, Merrill & Co., 2 Cir., 1894, 61 F. 689. There the plaintiff-copyright holder entered into a contract with one Alexander to bind the books. During the course of their business, Alexander would bind additional copies of the book and store them in anticipation of plaintiff's orders. A fire occurred at Alexander's bindery and it was thought that these stored books were too damaged to be sold. Alexander, with the plaintiff's permission, sold the debris to one Fitzgerald, who in turn sold them to waste paper dealers, incorporating the following clause as part of the contract:

"*It is understood that all paper taken out of the building is to be utilized as paper stock, and all books to be sold as paper stock only, and*

2. Although plaintiffs claim that some of the cover-removed comics are dyed blue on their edges, there is nothing in the record to show that the defendant possesses or sells comics with blue dye on them. Even assuming this fact, the act was not done by the defendant, but by wholesalers at the contractual directive of the plaintiffs.

*not placed on the market as anything else."* (Emphasis supplied.)

Subsequently copies of the copyrighted work appeared in the market offered for sale by the defendant, a secondhand book dealer. Plaintiff sought to restrain their sale by the defendant, asserting copyright infringement. The court held that since the plaintiff had parted with title to the copies, it was not a copyright infringement for the defendant to sell them as literature. Said the court at page 691:

"But the right to restrain the sale of a particular copy of the book by virtue of the copyright statutes has gone when the owner of the copyright and of that copy has parted with all his title to it, and has conferred an absolute title to the copy upon a purchaser, although with an agreement for a restricted use. The exclusive right to vend the particular copy no longer remains in the owner of the copyright by the copyright statutes. The new purchaser *cannot reprint the copy.* He cannot print or publish a new edition of the book; but, *the copy having been absolutely sold to him, the ordinary incidents of ownership in personal property, among which is the right of alienation, attach to it.* If he has agreed that he will not sell it for certain purposes or to certain persons and violates his agreement, and

sells to an innocent purchaser, he can be punished for a violation of his agreement; but neither is guilty, under the copyright statutes, of an infringement. If the new purchaser participates in the fraud, he may also share in the punishment. Clemens v. Estes, C.C., 22 Fed. 899." (Emphasis supplied.)

And this the court stated was the pertinent principle irrespective of whether the defendant had notice of the original contractual restriction.

This appeal provides an even stronger basis for holding that the defendant has not infringed the plaintiffs' copyright. The waste paper dealers purchased full title to the coverless comics without any restriction on their use whatsoever.[3] Although the contract between the wholesaler and distributor provides that the wholesaler obtain a written commitment from the waste paper dealer, the district court's finding of fact number 8, which is sustained by the record, shows: "There is no evidence that any of the wastepaper dealers from whom the defendant purchased coverless comics had, in fact, any contractual obligation to use such comics as wastepaper only."

Apart from this, though the contract between the distributor and the wholesaler provided: "Wholesaler agrees that such destroyed or mutilated portions of return copies shall be disposed of or sold

---

3. Since we have decided under the conversion portion of the opinion that the waste paper dealer and in turn the defendant acquired full title to the coverless-comics, we need not discuss plaintiffs' assertion that under the contract documents the publisher retained title to the coverless comics and the wholesaler was his agent for a limited purpose. However, assuming this to be the proper characterization of the relation, the agent's lack of authority to sell the literary property in the comics cannot form the basis of a charge of copyright infringement. Cf. Kipling v. G. P. Putnam's Sons, 2 Cir., 1903, 120 F. 631, 65 L.R.A. 873. In Kipling, the court stated at page 634 of 120 F.:

"It is contended that the plaintiff's copyrights were infringed by the defend-

ants because the books or sheets which they purchased of his licensed publishers were unbound at the time and the publishers were unauthorized to sell them in this condition. It is not quite apparent how the intent and purpose of the copyright act can be limited by a private agreement between the author and his publisher. There is nothing in the law, surely, which prohibits the owner of a copyright from selling unbound books, if he desires to do so, and what he may do, his agent or licensee may do also. If Mr. Kipling had personally sold the unbound volumes to defendants it probably would not be contended that he could recover damages under the statute because they were bound and resold. He stands in no more favorable condition because the sale was conducted by his agents."

for no other purpose than waste paper, * * * " under the rationale of the Harrison case, where the publisher has parted with the title to the copyrighted work and despite the fact that as between the immediate parties there is a contractual restriction on its use, this restriction does not bar subsequent purchasers from vending the periodical as a literary work free of the restriction. Harrison v. Maynard, Merrill & Co., supra. Cf. United States v. Wells, D.C.S.D.Tex.1959, 176 F.Supp. 630, 634.

Moreover, under the Copyright Act itself, it is provided that: " * * * *nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.*" (Emphasis supplied.) 17 U.S.C.A. § 27 (1952). Under this provision, once there is lawful ownership transferred to a first purchaser, the copyright holder's power of control in the sale of the copy ceases. This aptly fits the present situation. Plaintiffs could have destroyed the coverless comics or retained them. They had a legitimate interest to protect and the power to effectuate this aim. See Butterick Publishing Co. v. F. T. C., 2 Cir., 1936, 85 F.2d 522, 526. Actually there is testimony in the record by plaintiffs' own witness that other methods to destroy the coverless comics are being used. Instead, they allowed them to be sold to waste paper dealers. Having made this sale, the rights conferred by the Copyright Act are no longer operative. As was stated in United States v. Wells, supra, 176 F.Supp. at page 633:

"These provisions are considered to mean that the copyright proprietor is not empowered, merely by virtue of his copyright, to control the sales of published copies after they have come into the lawful ownership of the first purchaser. Whenever the copyright proprietor parts with title to a particular copy, the incident of his statutory monopoly having been exhausted by the exercise of the power of sale, is extinguished; the ordinary incidents of alienation belonging alike to all property attach to the material object in the hands of the new owner; and that copy is no longer under the copyright law insofar as the purchaser's right is concerned. Horace G. Ball, The Law of Copyright and Literary Property (1944) p. 437, et seq."

We are also satisfied that plaintiff's fourth theory, unfair competition, is inapplicable. From our previous discussion, it is clear that there is no misappropriation for commercial advantage by the defendant of plaintiffs' comics. Plaintiffs have exclusive control of the publication and distribution system of the comics; they direct the method by which the wholesalers can obtain credit for the unsold issues; they direct that the covers be removed; they direct the manner in which the coverless comics are to be disposed. Except for plaintiffs' failure to enforce the contractual provision between themselves and the wholesalers, the defendant would be unable to purchase the coverless books. Nor does the defendant aid in the breach of contract between the plaintiffs and the wholesalers. He simply buys the coverless comics in the ordinary course of business from waste paper dealers who had purchased them from the wholesalers without any restriction upon their use. Under the facts, the rationale of the following opinions cited by the plaintiffs is irrelevant. International News Service v. Associated Press, 1918, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211; Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483, affirmed 1951, 279 App.Div. 632, 107 N.Y.S.2d 795; Waring v. WDAS Broadcasting Station, Inc., 1937, 327 Pa. 433, 194 A. 631; Ettore v. Philco Television Broadcasting Corp., 3 Cir., 1956, 229 F.2d 481, 58 A.L.R.2d 626.

■ In each of plaintiffs' comics, appears a restriction which reads:

"This periodical may not be sold except by authorized dealers and is sold subject to the conditions that it shall not be sold or distributed with any part of its cover or markings re-

moved, nor in a mutilated condition, nor affixed to, nor as part of any advertising, literary or pictorial matter whatsoever."

It is argued that the district court should have issued an injunction to enforce the limitations of this language. Waring v. WDAS Broadcasting Station, Inc., supra. In Waring, the Supreme Court of Pennsylvania affirmed the issuance of an injunction preventing the defendant from playing certain of the plaintiff's recordings on radio broadcasts. On the records was the following notation, "Not licensed for radio broadcast." However, as this court observed in Ettore v. Philco Television Broadcasting Corporation, 3 Cir., 1956, 229 F.2d 481, 490–491, the legend was not the only factor which formed the basis for that court's decision and that: "The learned Justice, however, did not treat the restrictive legend as a factor operating altogether in Waring's favor." 229 F.2d at pages 490–491. It is clear that plaintiffs cannot argue that since they placed the legend on the comics, *ipso facto* they are entitled to an injunction. They have the burden of showing that all the facts (including the presence of the legend) rightly call for injunctive relief. And since we find that the totality of facts does not provide a proper foundation for the issuance of an injunction, the enforcement of the legend was properly denied.[4]

We have considered plaintiffs' remaining theory, invasion of the right of privacy and find it to be without merit.

The judgment of the district court will be affirmed.

4. Clearly under the Copyright Act, since there is no privity of contract between the parties the legend is unenforcible.

Bobbs-Merrill Co. v. Strauss, 1907, 210 U.S. 339, 350, 28 S.Ct. 722, 52 L.Ed. 1086.