Harry **WILLIAMS**, Appellant,

v.

**INDEPENDENT NEWS CO., INC.,** and National Periodical Publications, Inc.

No. 73–1001.

United States Court of Appeals, Third Circuit.

Argued June 18, 1973.

Decided Sept. 11, 1973.

As Amended Oct. 23, 1973.

David H. Pittinsky, Carl Hanzelik, Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., for appellant; William Pomerantz, Philadelphia, Pa., of counsel.

K. Robert Conrad, Barbara W. Mather, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellees.

Before VAN DUSEN, ALDISERT and ADAMS, Circuit Judges.

OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal from a judgment for the defendants entered upon a jury verdict in a private antitrust action calls for an examination of certain practices in the distribution and sale of comic books to determine whether they constituted per se violations of the antitrust laws. We find that no per se violations occurred, that the trial court committed no reversible error, and will affirm.

Appellant Williams, plaintiff in the action below, was a distributor of off-sale full-copy return comic books. An off-sale full-copy return comic book is a comic book which (1) was not purchased by the public and which is no longer current, either because a newer issue has been distributed, or because the period for its distribution has expired, and (2) has been returned back up the chain of distribution from the retailer to the wholesaler to the distributor to the publisher, without either the cover or any part of the contents of the comic book removed.

Independent News (Independent) was a national distributor of magazines and periodicals, including comic books. National Periodical Publications (National) was a publisher of magazines and periodicals, including comic books. During the period in question, Independent was a wholly-owned subsidiary of National, and was the exclusive distributor of comic books published by National. Magazine Management (Magazine) was the publisher of a line of comic books known as "Atlas" comics,[1] for which Independent was the exclusive distributor.

Williams was in the business of purchasing and reselling the off-sale full-copy return comic books of several publishers, including Magazine's Atlas comics. His sole source of supply for off-sale full-copy return Atlas comic books was one Israel Waldman, a middleman,

---

1. The cognoscenti will recognize "Atlas" as a tradename of "horror and mystery type" comics, of interest mainly to adults and older children. Specific titles include "Daredevil," "Venture into the Unknown," "Astounding Tales," "Tales to Astound," and "Sergeant York."

who from 1959 to 1963 purchased off-sale full-copy return Atlas comics from Magazine and resold some of them to Williams. During this period, Williams, purchasing approximately 350,000 off-sale full-copy return Atlas comics from Waldman each month, distributed all of these comics to wholesalers who would sell to retailers for resale to the public at a fraction of the cost of a current cover comic book.[2]

In 1957, prior to Williams' entry into the off-sale full-copy return comic book business, Independent contracted with Magazine for the exclusive distribution rights to Magazine's Atlas comics. Pursuant to that agreement, Magazine would deliver to Independent its most current issue of Atlas comics. Independent then distributed these comics to its regional wholesalers throughout the country. The wholesalers then distributed these current Atlas comics to retailers who sold them to the public.

About the same time that new Atlas comics arrived at the retail level, the retailers gathered together any previously distributed Atlas comics which had not been sold, and returned them, with covers and bodies intact, to Independent's wholesalers, who in turn shipped them to Magazine. These returns constituted Magazine's off-sale full-copy return Atlas comics.

After receiving these off-sale full-copy return comics, Magazine sold a portion for use overseas, and also sold some to Waldman, allegedly under the representation that Waldman would use the comics as "premiums."[3] As previously stated, however, Waldman sold a large quantity of these comics to Williams, who in turn placed them in the general sales market, and did not limit

their use as "premiums." After Williams resold to wholesalers and retailers, these off-sale full-copy return Atlas comics competed at the retail level with current cover Atlas comics. When Independent's wholesalers and retailers complained they were losing sales of current cover comic books because of the competition with full-copy returns sold at a discount, Independent reminded Magazine that their contract provided for the distribution of Atlas comics to news dealers and wholesalers solely through Independent, and suggested that Magazine investigate the source of these returns. Specifically, Independent advised Magazine to police their off-sale full-copy return sales to Waldman by making certain he was using the comics as premiums. When Magazine learned that Waldman was not using them as premiums, but rather was reselling these issues for distribution in competition with its current cover comic books, Magazine terminated its sale of Atlas comics to Waldman. As a result, Waldman could no longer supply Williams.

On January 23, 1968, Williams commenced this private antitrust action against Independent and National under Section 16 of the Clayton Act, 15 U.S.C. § 26, for equitable relief, and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages against the defendants for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The district court granted a motion for a directed verdict with respect to National, finding insufficient evidence of a conspiracy involving National to submit the question to the jury. The court did submit to the jury, however, the question of Independent's participation in a conspiracy to terminate appellant's supply, and the question of the legality of Independ-

---

2. Apparently there exists a good size market for these no longer current comics. There was testimony that these off-sale comics were distributed by Williams' wholesalers to "mom and pop" type stores which did not handle current cover comic books, and which could sell these off-sale comics for only four or five cents per copy. As appellant testified: "A comic book, if a certain person has never read

it . . . it is the same as new to the party purchasing it."

3. A premium is a comic book given away to children by a businessman as a gift or in a prize-bag in order to attract business. Comic book premiums do not compete with current cover comics because they are not sold to the public.

ent's contract with Magazine. The jury returned a general verdict in favor of Independent. The court, D.C., 350 F. Supp. 159, denied Williams' motions for judgment n.o.v. or a new trial, and this appeal followed.[4]

Distillation of appellant's numerous assignments of error yields two cognizable arguments:

(1) the agreement between Independent and Magazine for the exclusive distribution of Atlas comic books, and their conduct which eliminated Williams as a competitor, constituted a per se violation of Section 1 of the Sherman Act; and

(2) the trial court's instructions to the jury were erroneous, confusing and misleading, and the trial court committed several additional prejudicial errors.

### I.

In United States v. Arnold, Schwinn & Co., 388 U.S. 365, 379, 382, 87 S.Ct. 1856, 1865, 1867, 18 L.Ed.2d 1249 (1967), the Supreme Court held that an agreement which permits a party to retain control over either the destiny or the conditions of resale of a product after parting with title, dominion and risk over it, is a per se violation of Section 1 of the Sherman Act:

Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it.

. . . Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale.

\* \* \* \* \* \*

Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a per se violation of § 1 of the Sherman Act.

*See also* United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

The agreement between Magazine and Independent gave Independent the exclusive right to distribute all of Magazine's Atlas comic books. Williams does not attack this agreement insofar as it was limited to the exclusive right to distribute Magazine's current cover comic books. Rather, appellant argues that this contract was treated and understood by the parties to encompass Magazine's off-sale full-copy return Atlas comic books as well as current cover books notwithstanding the fact that Independent never distributed Magazine's off-sale full-copy return Atlas comics. Thus, appellant continues, "the common under-

---

4. This court has reviewed various aspects of similar litigation between these parties in the past. *See* Independent News Co. v. Williams, 293 F.2d 510 (3d Cir. 1961), where we framed the issue:

Can a second-hand periodical dealer who purchases *cover-removed* comics from waste paper dealers be enjoined under any one of six different legal theories, from marketing them as reading material?

293 F.2d at 511. (Emphasis supplied.) More recently, in 1968, Independent unsuccessfully sought an injunction against what it considered conversion by Williams of its literary property right in certain coverless comic books. 404 F.2d 758 (3d Cir. 1968).

Appellee contends that the present action is is barred by Rule 13(a), F.R.Civ.P., because it should have been asserted as a counterclaim to one of these earlier actions because it arose out of the same "transaction or occurrence" which was the subject matter of Independent's claim. Appellant argues that the factual and legal issues involved here bear no relationship to the issues of the earlier litigation, primarily because those cases dealt with coverless comics, an item which appellant deems an essentially different commodity from full-cover comic books. Because we affirm the judgment of the district court on the merits, we need not decide whether there exists the requisite relationship between these issues to bar this action.

standing of the parties was that the agreement between Magazine Management and Independent prohibited Magazine Management from selling its off-sale full-copy return Atlas comic books without Independent's prior approval." Appellant concludes that because Independent never distributed off-sale full-copy return Atlas comic books, and because Independent was without title, dominion and risk of loss over these comics, it was a per se violation of Section 1 of the Sherman Act for Independent to control the destiny and conditions of resale of these comics.

We take as our starting the language of the contract between Independent and Magazine:

### 1. THE PUBLISHERS AGREE:

(a) To give and grant and they hereby give and grant to the Distributor the exclusive right to sell and distribute throughout the world the aforementioned magazines and periodicals. . . .

On its face, this statement contains no indication what Magazine might do with the comics after their return. There is no restriction in the contract on the distribution by Magazine of off-sale full-copy return Atlas comics. And there is no provision requiring Independent's approval before Magazine's distribution of these books. Although at one point, there is a mention of full-copy returns,[5] the contract is in no way conclusive as to whether the returns are covered by the grant of exclusive distribution rights. Thus, the jury could well have concluded, as it apparently did, that Independent's exclusive distribution rights did not extend to returns.

■ Assuming that this contract did grant Independent distribution rights in off-sale returns as well as current cover comics, such an interpretation of the agreement would not present a

per se violation of the Sherman Act. Presented would be merely an exclusive dealing agreement covering current as well as off-sale comic books. Exclusive dealing agreements are, of course, not illegal per se. Colorado Pump & Supply Co. v. Febco, Inc., 472 F.2d 637 (10th Cir. 1973); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L. Ed.2d 755 (1970). In United States v. Arnold, Schwinn & Co., *supra*, the Court stated:

[A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods. . . . If the restraint stops at that point—if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act.

Judged by this standard, the only restraint imposed by this agreement was a vertical one between Magazine and Independent. By definition an exclusive dealing contract excludes potential competitors from competition with the exclusive dealer. Such a restraint is not per se unreasonable. Therefore, accepting appellant's argument in full force, we conclude that he failed to prove more than the existence of an exclusive dealing contract.

■ Alternatively, appellant argues that its proof at trial of the relationship between Magazine and Independent demonstrated the existence of a combination or conspiracy in violation of the Sherman Act as a matter of law. Albrecht v. The Herald Co., 390 U.S. 145, 88 S.Ct.

---

5. The contract states:

(g) . . . In the New York metropolitan area, and in such other areas as Publishers request in writing, Distributor will use best efforts to obtain full copy returns, and in such case Publishers agree to pay for return transportation and such handling charges as are required. . . .

869, 19 L.Ed.2d 998 (1968); United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed. 415 (1966); and Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874 (1st Cir. 1966). While it is true that Independent approached Magazine when off-sale full-copy returns began appearing in Independent's market areas, Paul Sampliner, then President of Independent, testified that he never told Magazine it would have to terminate its sales to Waldman:

> Q. And at that point in time did you, on behalf of Independent News, tell either Mr. Hayes or Mr. Goodman that they would have to terminate their sales to Mr. Waldman—
>
> A. No, I never told him that. I told him that they had to police them better, that if they wanted to continue their sales that they had to see to it that they went through the proper channels that Mr. Waldman promised.

Stated otherwise, Sampliner told Magazine that it could continue to sell off-sale full-copy returns if they were distributed as premiums.[6] Moreover, John Hayes, then assistant to the President of Magazine, and appellant's own witness, testified that Waldman was terminated

because Magazine, for its own best business interests, had no intention to sell comics to him other than for premiums.[7] When Waldman confessed that he was reselling into a retail market, he was terminated for that reason. This is hardly sufficient evidence upon which to find a conspiracy to violate the antitrust laws.

Even assuming that Independent directed Magazine to terminate Waldman, we believe Independent had the right to take steps to enforce its exclusive dealing contract. Williams could not have complained if, in violation of the exclusive dealing provisions of Magazine's distribution contract with Independent, Magazine had sold current cover comics to Waldman, and then ceased such sales at Independent's insistence. A fair evaluation of all the evidence, both documentary and oral, could support an interpretation of the agreement that Independent had the right to distribute off-sale full-copy return Atlas comics to the exclusion of all others, including Magazine. Although Independent may be said to have consented to Magazine's limited distribution of these comics, there is no specific evidence in the record that Inde-

6. The dissent strives to dilute the exclusive dealing arrangement. This sentence is quoted at 1109 and the suggestion is made that it forms the basis from which the jury might conclude that the exclusive dealing arrangement did not cover the sale of returned comics. Having said this, the dissent immediately concedes that Sampliner testified that the agreement extended to off-sale full-copy returns as well as current comics. Specifically, this was the testimony:

> Q. In other words, Mr. Sampliner, it was your understanding that under the terms of your agreement with Magazine Management, P9, that Independent News was the exclusive distributor for the off sale full copy returns of Magazine Management comics?
>
> A. The answer is yes.

Moreover, the dissent neglects appellant's express concession (Brief at 19) that the "*undisputed* testimony adduced at trial established that . . . [the] contract was treated and understood by the parties thereto to encompass Magazine Management's off-sale full-copy return Atlas comic books as well as its current cover comic books. . . ."

7. 
> Q. Now, you had a verbal agreement with Mr. Waldman with respect to the sale of some part of your full cover returns. Is that correct?
>
> Mr. Carpency: Mr. I. Waldman.
>
> A. I don't understand the question. I pointed out before that I. Waldman was doing business with Magazine Management many years before I arrived at that position.
>
> Number two, the verbal agreement we had with him was that the comics were being channeled into premium accounts.
>
> Q. Did you ever authorize Mr. I. Waldman to sell your full-copy returns for resale to the general public?
>
> A. No.
>
> Q. Do you know why such authority was not given to Mr. Waldman?
>
> A. For the simple reason we would run into all kinds of problems with our distributor, a national distributor and wholesalers, and just like everybody else it is just not done in our trade.
>
> Q. It was in your best interests not to conflict the profitability of your current line, is that correct?
>
> A. That is correct.

pendent waived all distribution rights thereto.

Thus, Independent's efforts to enforce its exclusive distribution rights are clearly distinguishable from those activities found illegal in *Ford* and *General Motors, supra.* In those cases, no exclusive dealing arrangement existed. Instead, dealers who had no enforceable exclusory rights sought to eliminate competition from other dealers by conspiring with the competitor's supplier. Could appellant complain of an antitrust violation if Independent had taken steps to specifically enforce its contractual rights in a court of equity? If not, how can Independent's efforts to resolve a dispute amicably with Magazine, without resort to litigation, be transformed from the acts of an aggrieved contract party to those of a violator of antitrust laws? The short answer is they cannot be. We therefore reject this contention of appellant.

## II.

Appellant mounts a number of attacks upon the charge as given, assigns as error the district court's refusal to charge as requested, and additionally claims prejudicial error occurred in other aspects of the trial.

■ Appellant alleges a violation of F.R.Civ.P. 51 in that the trial judge did not rule on the jury instructions proposed by the parties prior to their arguments to the jury, the judge having reserved the right to fashion his instructions until after having heard these arguments. Appellant contends he was thus deprived of the opportunity of arguing his *Schwinn* contention properly. Although the district court's procedure was irregular, the same can be said about the proposed instructions submitted by counsel. Implicit in Rule 51 is the reception by the court of specific points for charge, preferably numbered, and so framed that they have the capability of being affirmed or refused, point. by point. What counsel did in this case was to present to the court a written instrument which was tantamount to a complete jury charge. Such submissions are not envisioned in the conceptual basis of Rule 51. While it may have been more prudent for the court not to have encouraged requests in this form and to have insisted that traditional practice be observed, we cannot say that the court's action constituted reversible error. A fair reading of the record has convinced us that appellant was forewarned prior to his closing jury speech as to the critical instructions which were ultimately delivered by the court.

■ Appellant's first group of attacks upon the jury instructions relate to appellant's *Schwinn* theory of liability. Appellant claims issues of law were submitted to the jury as questions of fact. To the extent that this was done, we conclude that the legal issues should have been resolved adversely to appellant, and that appellant suffered no prejudice by their submission to the jury. Appellant complains of the trial court's refusal to charge on the applicability of the per se rule. We have already concluded that the per se rule was inapplicable to this case; therefore, the trial court's refusal to charge on the per se rule was not error.

■ Appellant's final attack on the *Schwinn* instructions relates to the trial judge's correction of an error in the charge as originally given; appellant claiming the court's efforts to correct the error were inadequate. We are satisfied that the charge, both as originally given and as modified, was more than fair to appellant's position and that no further steps were required of the district judge to amplify the jury's understanding of the appropriate law. The alleged error in the original charge related to the question whether the comics were distributed on an agency and consignment basis or a sale basis; appellant contending either system could be violative of the antitrust laws. We have already resolved that as a matter of law the contract was one for exclusive dealing embracing both current cover and

off-sale full-copy return Atlas comic books. In light of this determination, the consignment versus sale issue becomes moot and any error in the jury's consideration of the issue was not prejudicial.[8]

Additionally, appellant assigns as reversible error that portion of the jury instructions describing the conspiracy theory of antitrust liability. The charge on this point is set forth in the margin.[9] Appellant contends this

8. The dissent questions the clarity of the court's *Schwinn* charge in light of the complexity of the facts adduced at trial. We do not agree. The court charged:

> If on the other hand you find that there was a sale, that Magazine Management sold to Independent and Independent resold the magazine, then you have the question of whether there was an agreement between Independent and Magazine Management under the terms of which Magazine Management, for the benefit of Independent, would restrict the resale of these magazines.
>
> You see, what the plaintiff is suggesting to you, to sort of turn the facts of Schwinn around and consider the flow back of the magazines after they have gone down the chain of distribution, gone down to the retailer, and started back up, and their argument is this: at the time they get to Independent, Independent is really the owner of the magazines, and it, in effect, by returning them to Magazine Management and getting a credit from Magazine Management is selling them back to Magazine Management, and if that is what it is doing, if it is conditioning its sale to Magazine Management on an agreement that Magazine Management will not resell except for premiums, so forth and so on, then that agreement is a violation of the Sherman Act, section one, as in the Schwinn case.

(App. 532a–33a).

These instructions made it clear to the jury that they must find not only a sale from Independent to Magazine, but also an agreement to restrict the resale of these comics. *United States v. Arnold Schwinn & Co., supra*, 388 U.S. at 382, 87 S.Ct. 1856.

9. Now the second theory of recovery that has been advanced to you by the plaintiff, is a conspiracy theory, and a conspiracy is basically an agreement between two or more persons. You have to have at least two persons to have a conspiracy, to do either an unlawful act or to do an act which in and of itself is lawful, but which accomplishes an unlawful result, and the theory here is the latter, that even though there is no question that Magazine Management independently has the right to sell or not to sell to whomever it wants to, if in combination with Independent News it determined not to sell to Waldman for the purpose of preventing Williams from competing with Inde-

pendent News, then that is a combination or conspiracy which violates the antitrust laws.

Now, on this issue you have some credibility questions that you have got to resolve, and basically the question, I think, gets down to, well, why did Magazine Management stop selling to Waldman? And there are two theories advanced to you on that issue, and they are as follows: The plaintiff's theory is that Magazine Management was getting rid of a lot of these off-sale copies through Waldman, and Waldman in turn was selling them to Williams, and that Magazine Management was perfectly content to have Waldman sell Williams, who in turn resold in the domestic market until the retailers and wholesalers of Independent News started to complain to Independent News, and then according to the plaintiff's theory Independent News brought these complaints to the attention of Magazine Management and coerced Magazine Management into cutting Waldman off, not because of any reasons, good business reasons of Magazine Management, but because they yielded to the pressure of Independent News to prevent Williams from competing with the wholesalers and retailers of Independent News. That, I think, basically is the theory of the plaintiff; that Magazine Management really didn't care about what happened in the after-market after they sold them to Waldman until they were pressured by Independent, which was complaining about the pressure it was getting from its wholesalers and retailers, and therefore yielding to that pressure they cut off Waldman for the purpose of injuring Williams and driving him out of competition, and if you accept that version of the facts, if you think that that is the proper version of the facts, then you can find from this evidence that there was a combination or conspiracy which was a violation of the antitrust laws, and then you would have to determine to what extent, if any, did that combination or conspiracy resulting in William being cut off, cause him economic injury.

The dissent concludes at 1110 that the combination element of § 1 of the Sherman Act should have been more meaningfully developed by the court in its charge to the jury, suggesting that if Independent brought pressure to bear on Magazine, the jury might find such pressure to be a combination to restrain trade. Since testimony was introduced relating to Independent's pressure, the dissent concludes

charge required the jury to find that Independent "coerced" or "pressured" Magazine into terminating Waldman as a prerequisite to finding a conspiracy. A careful reading of this portion of the instruction demonstrates that the words now found objectionable by appellant appeared as part of the court's explanation to the jury of appellant's conspiracy theory of liability. This explanation was, we believe, accurate. Any difficulty or prejudice inhering in the use of the words "coerce" or "pressure" were not injected into the case *sua sponte* by the trial judge but resulted from appellant's theory and the manner in which the case was presented. Moreover, as heretofore observed, the distribution agreement may be interpreted as granting to Independent exclusive distribution rights in off-sale full-copy returns. Also, because we have concluded that under the exclusive dealing arrangement Independent could take the steps it did to enforce its exclusive distribution rights without incurring antitrust liability, appellant was not prejudiced by the conspiracy charge as given.

We have considered appellant's other assignments of error relating to the jury instructions and other aspects of the trial and find them uniformly lacking in merit.

The judgment of the district court will be affirmed.

ADAMS, Circuit Judge (dissenting).

My interpretation of the operative facts of this case leads to the conclusion that the principles of per se liability formulated in United States v. Arnold, Schwinn & Co.[1] have a controlling impact on the issue of the defendant's liability. Therefore, I am impelled to this separate opinion.

The distribution system employed during the period in question by the publisher of Atlas comics, Magazine Management (Magazine), may be effectively analyzed as a series of steps or links. Magazine would deliver the most recent issue of Atlas comics for distribution, pursuant to an exclusive distribution contract, to Independent News (Independent), defendant-appellee.[2] Independent would then distribute the comics to wholesalers who would in turn distribute to retailers.

Roughly contemporaneously with the arrival of current comics, the retailers would return all previously-received, unsold comics, back through the distribution chain, to Magazine. As the new comics had been distributed down to the retailers, payment for the shipments had been made at each step. As the unsold comic books were returned up the chain to Magazine, credits for the returns were granted.

Upon receipt of these returned comics, Magazine resold them to I. Waldman on the condition that Waldman was to resell them only to those who would use the comics as premiums.[3] However, Waldman sold the return comics to Harry Williams, plaintiff-appellant here, who in turn sold them to retailers for sale at a price below the newsstand price of the current issue of Atlas comics.

The sellers of current Atlas comic books, objecting to the presence on the market of Atlas comic books that were now being sold at a lesser price because they were no longer "current," registered their dissatisfaction to Independent. The Vice President of Independent conveyed its displeasure at such sales of returned comic books for other than premium purposes; thereafter, Magazine terminated its sales to Waldman.

---

that the jury should have been instructed to determine whether there existed a combination between Independent and Magazine. A fair reading of the court's charge discloses that this was exactly what the jury was instructed to determine.

1. 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

2. National Periodical Publications, the owner of Independent, was named as a defendant in the original action. Its motion for a directed verdict was granted by the trial court, and I concur in the majority's affirmance of that action.

3. Premiums are defined at footnote 3 of the majority opinion.

Although the written contract between Independent and Magazine recited that Independent was to have "the exclusive right to sell and distribute [Atlas comics] throughout the world . . .," testimony of the President of Independent clearly indicates that the understanding between them was that Magazine could sell off-sale comics to other parties so long as the others were required to confine their sales to certain types of customers, *i.e.,* those who would distribute the off-sale comics as premiums.

Thus, the majority paraphrases the testimony of the President of Independent on this point, as follows:

"Stated otherwise, Sampliner [the President of Independent] told Magazine that it could continue to sell off-sale full-copy returns if they were distributed as premiums."

Such evidence, it is suggested, takes the present suit out of the classic "exclusive dealing" group of cases, or at least forms the basis by which the jury might conclude that the exclusive dealing arrangement did not, *in fact,* cover the sale of the books returned,[4] although there was testimony by Sampliner that it did.

In contrast, the majority views. the facts as constituting a typical exclusive dealing situation. It points out that if a manufacturer or distributor, who does not have a monopoly over sales of a product, chooses to sell its product exclusively to one dealer, that is not, by itself, an antitrust violation. Firstly, if the new and off-sale books are considered as one product, Magazine did not choose to sell such product to one dealer.

Under this concept of one product it admittedly chose to sell a portion of such product to Independent and a portion of such interest in Waldman. Secondly, there is nothing in this case that would prevent the jury from finding that the comic books involved here constitute, from a marketing standpoint, two separate products, depending on which stage of the distribution chain is considered. Thus, there are new comic books, and there are off-sale comic books. Although the written contract is not clearly so restricted, there is ample evidence that would indicate that Independent had an exclusive contract to sell Magazine's *new* comic books. Consequently, the jury might well have found that Independent had no exclusive agreement to sell the off-sale or returned books—the product which really forms the basis of the complaint. And the fact is that Magazine sold the off-sale or returned books through other than Independent, with Independent's acquiescence.[5]

Once it is recognized that there is credible evidence in the record that would permit the jury to find that this is not an "exclusive dealing" case, at least so far as the off-sale or returned books are concerned, it becomes necessary to focus on the two steps in the distribution chain of off-sale comic books—the link which sends these comics from Independent or its wholesalers to Magazine, and the next step, the sale of the off-sale comics by Magazine to Waldman. Proper evaluation of these steps is crucial in any attempt to measure the facts of this case against the standards of the antitrust laws.

4. The majority discusses, at some length, the rules to be employed in considering the legality of exclusive dealing contracts. *See* text following note 5 of majority opinion. Justice Fortas, in Schwinn, stated: "At the other extreme, a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may 'franchise' certain dealers to whom, alone, he will sell his goods . . . *If the restraint stops at that point*—if nothing more is in-

volved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act." (388 U.S. at 376, 87 S.Ct. at 1864). (Emphasis added.)

5. See appendix for schematic representation illustrating the distribution or sale of new comics and the return and sale of off-sale comic books.

At the Independent-Magazine step, there is evidence that Magazine credited Independent for returned, off-sale, comic books. This crediting may be viewed as a complete transfer of ownership to Magazine, removing all risk and dominion over the books from Independent. Regardless of the characterization of earlier steps, it is apparent that at this point in the distribution arrangement Magazine fully owned the off-sale comic books.

The very next step, the transaction between Magazine and Waldman covering the off-sale comics, was an outright sale. Magazine relinquished its full interest in the comics and thereby passed to Waldman full title, risk and dominion. Waldman, however, was allegedly to be restricted as to the type of customers to whom he could resell these comics. There is credible testimony from which the jury could find that Waldman's violations of this restriction led to both warnings of termination and actual termination of sales from Magazine to him.

The charge of the trial court did not ask the jurors to focus separately on either of the two discrete links in the distribution chain, the one from Independent to Magazine, and the one from Magazine to Waldman. Rather, a significant portion of the charge instructed the jurors that they were to determine "What kind of distribution system was this?" (N.T. 496) The jury was then advised that if it was a consignment or agency arrangement, then there should be a finding for the defendant on the first theory [the *per se* violation theory]. (N.T. 496)[6]

Further, the trial court emphasized for the jurors the term "conspiracy" as used in Section One of the Sherman Act.[7] The proscription of the Act, however, is not limited to conspiracies, but makes a "combination" illegal as well, and the "combination" concept was referred to, but was not sufficiently developed so as to be meaningful to the jury. (N.T. 498)

In *Schwinn*,[8] a chain of distribution quite similar to that here was examined by the Supreme Court. Schwinn, a leading manufacturer of bicycles, employed several different patterns of distribution. One system consisted of Schwinn, the manufacturer, selling the bicycles to cycle distributors, to a large tire company, and to hardware jobbers. These groups of wholesalers "were instructed to sell only to franchised Schwinn accounts and only in their respective territories which were specifically described and allocated on an exclusive basis."[9] A second arrangement had Schwinn selling directly to franchised retailers who were "authorized to sell only to consumers, and not to unfranchised retailers."[10] The third method of distribution utilized consignment shipments to the wholesalers.

Schwinn "resolutely policed" the restraints contained in the two "sale" patterns of distribution, its power to enforce them being "grounded upon the communicated danger of termination."[11]

The United States brought a civil antitrust suit against Schwinn, asserting, *inter alia*, that the restrictions as to customers and territories imposed by Schwinn constituted *per se* violations of Section One of the Sherman Act.[12]

---

6. The district court may have had in mind the statement in *Schwinn* that if there is an agency relationship, the transfer from the manufacturer to its distributor might be accompanied by a restriction without creating a *per se* violation. 388 U.S. at 371, 87 S.Ct. 1856.

However, there was no evidence that the arrangements vis-a-vis Magazine and Waldman amounted to an agency, consignment, or franchise.

7. 15 U.S.C. § 1.

8. 388 U.S. 365, 87 S.Ct. 1856 (1967).

9. 388 U.S. at 371, 87 S.Ct. at 1861.

10. *Id.*

11. *Id.* at 372, 87 S.Ct. at 1862.

12. 15 U.S.C. § 1. That section provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint

The Supreme Court, asserting that restrictions imposed upon customers who had acquired title, risk and dominion offended the "ancient rule against restraints on alienation,"[13] held that Schwinn's attempt to limit its distributors' choice of customers was a *per se* violation.

"Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act."[14]

Returning to the off-sale comic book distribution arrangement, two links in that chain bear a marked resemblance to the wholesaler sales and retailer sales in the *Schwinn* case.

Focusing first on the Independent-Magazine link, the evidence indicates that the procedure employed consisted of Independent returning the comics to Magazine and receiving, at that time, full credit for those returns.[15] At that juncture, so far as the record indicates, the interest of Independent in the off-sale books was extinguished, and all title, risk and dominion was vested in Magazine. Nonetheless, Magazine was not free to deal with the comic books as it chose. Rather, evidence was introduced which showed that although Magazine was in a position to sell these off-sale comics to certain types of cus-

tomers, it could not sell to all types of customers—at least not free from pressure exerted by its important customer, Independent. Up to this point, the analogy to *Schwinn* is quite close, if not perfect. Both cases involved restrictions as to customers, imposed on a purchaser who has acquired complete title, risk and dominion.

What is missing to complete the analogue is a finding that the customer restrictions imposed on the purchaser, here Magazine, were imposed and enforced by Independent. There was evidence adduced which, if believed, would support a finding that Independent did impose and enforce such a restriction.

It was not sufficient that the charge in this regard should have merely requested the jury to consider the characterization of the Independent-Magazine arrangement. Rather, the charge should have requested the jury to determine whether or not Independent exercised control over Magazine's sale of the off-sale comics. Although the trial court did advert to this point, the reference was not sufficiently clear to make it understandable in light of the complex factual situation that obtained. A finding by the jury that Independent did impose such restriction on Magazine would have been a basis for concluding that Independent was liable for a *per se* violation of § 1 of the Sherman Act, as interpreted by *Schwinn*.

Shifting the examination to the Magazine-Waldman link leads to a similar conclusion.[16]

---

of trade . . . is declared to be illegal. . . ."

A practice deemed to be *per se* illegal is one in which the Court finds that its anticompetitive effects are such as to preclude the possibility of legally cognizable business justifications. As Justice White put it in *Schwinn* (388 U.S. at 379, 87 S.Ct. 1865): "Such restraints are so obviously destructive of competition that their mere existence is enough."

13. 388 U.S. at 380, 87 S.Ct. at 1866.

14. *Id.* at 382, 87 S.Ct. at 1867.

15. Analyzed in this way, Independent assumes the position of Schwinn and Magazine, the

role of the distributors and retailers. In other words, at this stage in the distribution chain of off-sale books, Independent is a "seller" and Magazine its "purchaser."

16. Although this approach is not suggested by the plaintiffs, it, too, seems to be mandated by an application of the principles in *Schwinn* to the facts of this case.

As Justice Fortas stated: "Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. . . . Such restraints are so obviously destructive of com-

The comparison between the distributor or retailer link in the *Schwinn* chain on the one hand, and the Magazine-Waldman link in the Atlas comic chain on the other, is not difficult to draw.[17] Magazine, like Schwinn, sought to limit the type of customers to whom its purchaser could sell. Both Magazine and Schwinn had relinquished title, risk and dominion to their respective purchasers. Then, both attempted to enforce the limitations by the "communicated danger of termination."[18] Magazine, in fact, went one step further and did terminate its recalcitrant purchaser.

The termination of Waldman directly injured Williams, ending his source of off-sale comic books. Thus, were this a suit by Williams against Magazine, it might well be found that Magazine had committed a *per se* violation as to Williams.

This does not, however, conclude the inquiry, because the defendant in the suit is Independent, not Magazine. Nonetheless, if Independent brought pressure to bear on Magazine for the purpose of having Magazine limit Waldman's use of the off-sale comic books for premiums or else be terminated, that exertion of influence might be found by the jury to be a combination to restrain trade.[19] Such a combination would render those who join it guilty of a violation of § 1 of the Sherman Act.[20] Testimony was introduced which showed that Independent had brought pressure to bear on Magazine. Thus, the majority states:

". . . Independent reminded Magazine that their contract provided for the distribution of Atlas comics to new dealers and wholesalers solely through Independent, and suggested that Magazine investigate the source of these returns. Specifically, *Independent advised Magazine to police their off-sale full-copy return sales to Waldman by making certain he was using the comics as premiums.*" (Emphasis added)

Based on such evidence, the jury should have been instructed that they were to determine whether there existed a combination between Independent and Magazine.

Whether viewed from the standpoint of the Independent-Magazine link or from the standpoint of the Magazine-Waldman link, it appears that the charge of the distinguished trial judge was not correct.[21] It did not present to

---

petition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale. . . . On the other hand . . . we are not prepared to introduce the inflexibility which a *per se* rule might bring if it were applied to prohibit all vertical restrictions of territory and all franchising, in the sense of designating specified distributors and retailers as the chosen instruments through which the manufacturer, retaining ownership of the goods, will distribute them to the public.

.    .    .    .    .

"This does not, of course, excuse or condone the *per se* violations which, in substance, consist of the control over the resale of Schwinn's products after Schwinn has parted with ownership thereof. Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred—whether by explicit agreement or by

silent combination or understanding with his vendee—is a *per se* violation of § 1 of the Sherman Act." 388 U.S. at 379–380, 382, 87 S.Ct. at 1865–1866, 1867.

17. In this approach, Magazine assumes Schwinn's station, and Waldman's position is the same as that of Schwinn's distributors and retailers. *Cf.* fn. 15.

18. 388 U.S. at 372, 87 S.Ct. at 1862.

19. *See* Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

20. 15 U.S.C. § 1.

21. As the majority points out, the fault was not entirely that of the trial judge, since through some misunderstanding the requests for charge had been submitted in narrative form. However, after the charge, plaintiff sought a clarification regarding the use by the court of the rule of reason in connection with the transfer by Independent to Magazine of

the jury an accurate description of when the rule of reason could or could not be applied. Thus, the case should be remanded to the district court for a new trial, conducted in conformity with the legal theories set forth by the Supreme Court in *Schwinn*.

Although the conclusion reached in this dissenting opinion is predicated heavily on *Schwinn*, it would be remiss not to point out the criticism that has been directed at that case.[22] The commentators make clear that the Supreme Court's adoption of a *per se* rule applicable to products passing through the chain of distribution by sale created an unnatural distinction between sales and agency arrangements. Further, they strongly suggest that in certain circumstances the restrictions condemned in *Schwinn* appear to serve salutary purposes, and their illegality should be based on a benchmark of reasonableness rather than condemned out of hand by a *per se* rule.

However, such contentions, presumably considered in *Schwinn*, were rejected by the Supreme Court in that very case. And the position established in *Schwinn* has been reiterated by the Court just this term: "The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct." [23]

Moreover, the Supreme Court has not only had recent occasion to refer to language used in *Schwinn*, but has made it clear that the principle enunciated there has continuing vitality. [24]

An intermediate appellate court may not pursue its own ideas as to the economic wisdom of a certain practice or as to the legality of that practice. Rather, if the way is illumined by the Supreme Court, we are duty-bound to follow the path.

Therefore, I would remand this case to the district court for a new trial in which the rule of the *Schwinn* case would be appropriately applied.[25]

the off-sale comics on the ground that if such transfer were accompanied by a restriction, a *per se* violation may well have occurred. (N.T. 506) The trial court did not clarify this point, but instead repeated the use of the rule of reason in connection with the restriction allegedly imposed on Magazine so far as the resale of the off-sale comics was concerned. (N.T. 511).

22. *See* Handler, The Twentieth Annual Antitrust Review, 53 Va.L.Rev. 1667, 1680–89 (1967). Note, The Supreme Court, 1966 Term, 81 Harv.L.Rev. 69, 235–9 (1967).

23. Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) quoting United States v. Arnold, Schwinn & Co., 388 U.S. at 375, 87 S.Ct. 1856.
   In Tripoli Co. v. Wella Corp., 425 F.2d 932 (3d Cir. 1970) (en banc) this Court held that the rule of *Schwinn* did not invalidate certain resale restrictions imposed by a manufacturer upon a wholesale distributor, even though there had been a completed sale by the former to the latter. However, the manufacturer alleged, as justification for the restrictions, that

they served to protect the public against physical injury, and to protect the manufacturer against potential product liability. *Tripoli* is thus readily distinguishable from this case, since no such justifications were proffered here.

24. *See* United States v. Topco Assoc., Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

25. In *Schwinn*, the Supreme Court remanded with the instruction that: "[T]he decree should be revised to enjoin any limitation upon the freedom of distributors to dispose of the Schwinn products, which they have bought from Schwinn, where and to whomever they choose." 388 U.S. at 378, 87 S.Ct. at 1865.
   Issues of collateral estoppel and compulsory counterclaim have been raised on this appeal. The majority, deciding the case on the merits, does not address these procedural questions. Although the problems presented are not without some merit, in view of the fact that this is a minority opinion, further discussion of these issues would not appear fruitful.

APPENDIX

DISTRIBUTION ROUTES FOR NEW AND OFF-SALE COMIC BOOKS

[A9272]