**SHELDON PONTIAC, a corporation of New Jersey, Plaintiff,**

v.

**PONTIAC MOTOR DIVISION, GENERAL MOTORS CORPORATION, a corporation of Delaware, Defendant.**

Civ. No. 75–556.

United States District Court, D. New Jersey.

Aug. 24, 1976.

 

Joseph Gordon, Gordon & Kanengiser, Springfield, N. J., Patrick Frega, Lynch & Frega, East Brunswick, N. J., for plaintiff.

Michael S. Waters, Carpenter, Bennett & Morrissey, Newark, N. J., for defendant.

OPINION

LACEY, District Judge.

Sheldon Pontiac, Inc. (Sheldon Pontiac) is a corporation organized under the laws of the State of Delaware with its principal place of business at 250 George Street, New Brunswick, New Jersey. At that location, Sheldon Pontiac is engaged in the sale of both new and used automobiles. Pontiac Motor Division is part of General Motors Corporation (PMD), a corporation organized and existing under the laws of the State of Delaware.

Sheldon Pontiac has brought this action charging PMD with a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The complaint alleges that PMD, and others, have combined and conspired to restrain trade and commerce and that PMD has attempted to "prohibit such trade and commerce . . . ." Sheldon Pontiac does not allege a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Specifically, the complaint charges that PMD and others have agreed to allocate geographic markets in retail automobile dealerships to eliminate and reduce competition in trade and commerce.

Sheldon Pontiac operates under a Pontiac Dealer Sales and Service Agreement; a Primary Area of Responsibility Supplement (Uniform Agreement), dated November 1, 1970; and a letter modification of the Uniform Agreement, dated June 17, 1974. Section 5B of the Uniform Agreement provides:

> Pontiac and Dealer recognize that Dealer is free to sell Motor Vehicles, Parts and Accessories *to customers wherever they may be located.* However, in order that Pontiac may establish and maintain an effective network of franchised Pontiac dealers for the sale and service of Pontiac motor vehicles, Dealer shall not, either directly or indirectly, establish any place or places of business for the conduct of any of its Dealership Operations except at the locations and for the purposes described in a current Statement of Dealership Premises that has been executed as provided in subsection A of this Section 5.

While this Agreement shall be in effect, Pontiac shall not execute a Pontiac Dealer Sales and Service Agreement with any party under which such party will establish a new or additional principal Pontiac dealership operation within five (5) miles or less normal and direct driving distance from Dealer's principal Dealership Operations, unless Pontiac shall have notified Dealer thereof at least thirty (30) days prior to committing itself to the execution of such Pontiac Dealer Sales and Service Agreement. During such thirty (30) day period, Dealer may present to Pontiac any facts having a bearing in the matter. This provision, however, shall not apply to Pontiac's execution of a Pontiac Dealer Sales and Service Agreement with any party that will establish thereunder replacement dealership operations at dealership locations previously approved by Pontiac for franchised Pontiac dealership operations. (Emphasis added).

It is charged that PMD requires all its dealers to subscribe to the Uniform Agreement. Sheldon Pontiac further alleges that PMD arbitrarily and unreasonably enforces Section 5B of the Uniform Agreement to the extent that PMD routinely refuses to approve applications to open dealerships in certain areas where the new dealer would be within five miles from a dealer already located in the area.

Sheldon Pontiac claims that PMD has invoked Section 5B of the Uniform Agreement to prevent Sheldon Pontiac from changing its present location, and thereby furthering the combination and conspiracy charged in the complaint. Specifically, it is claimed that in the autumn of 1969 Sheldon Pontiac sought to change its present location at 250 George Street, New Brunswick, to a different site on Route 18, East Brunswick. Sheldon Pontiac alleges that it desired to relocate to East Brunswick because potential customers were reluctant to come into New Brunswick in the evening; and that, as a result, Sheldon Pontiac was losing business at its New Brunswick location. It is claimed that pursuant to the terms of Section 5B Sheldon Pontiac notified PMD of its desire to change its location to Route 18, East Brunswick. This request was refused because, according to Sheldon Pontiac, the new location was not more than five miles away from Armstrong Pontiac, another dealer in the area.

Sheldon Pontiac seeks certain declaratory and injunctive relief which would have the effect of permitting Sheldon Pontiac to change its location to Route 18 in East Brunswick. Treble damages and reasonable attorneys' fees are also requested. 15 U.S.C. § 15.

### FINDINGS OF FACT

1. Sheldon Pontiac has been in business at its present location in New Brunswick for approximately 22 years as a Pontiac automobile dealer, providing for the retail sales of automobiles in addition to customer warranty and maintenance service. (Tr. 11–12; Jt. Ex. 1, at 12–13, para. 9). Sheldon H. Schiffman (Schiffman) the president and major stockholder of Sheldon Pontiac, has operated the business since its formation. (Tr. 11).

2. Under the Pontiac Dealers Sales and Service Agreement, the Uniform Agreement (Jt. Ex. 1), and the letter modification of the Uniform Agreement (Jt. Ex. 2), Sheldon Pontiac operates its business as a franchise.

3. As the Uniform Agreement provides, the franchisee is to conduct operations at 250 George Street, New Brunswick, and may not change its location without the consent of PMD. Sheldon Pontiac's "Primary Area of Responsibility" is defined in the Uniform Agreement as follows:

NEW YORK—NORTHERN NEW JERSEY
SECTION 16
IN THE STATE OF NEW JERSEY

In Middlesex County

All of Middlesex County, New Jersey except the communities of Dunellen, Piscataway and South Plainfield in Piscataway Township, and the communities of Avenel, Carteret and Colonia in Woodbridge

Township; also the Borough of of Middlesex.

### In Somerset County

In Somerset County, New Jersey the Township of Franklin.

4. Sheldon Pontiac is not restricted as to the geographical area in which it may sell automobiles, or as to the purchasers whom it may solicit for sale, but may sell to whomever it chooses, wherever located. (Tr. 169–70). Sheldon Pontiac has sold new Pontiac passenger cars outside its "Primary Area of Responsibility", in the counties of Northern and Western New Jersey, including Passaic, Bergen, Morris, Union, Essex, Warren, Hunterdon, and Mercer, as well as in Pennsylvania and New York. (Tr. 165–67). In selling in such other areas, Sheldon Pontiac does not seek, nor is it required to seek, clearance from other Pontiac dealers. (Tr. 169–70). Thus, there are no territorial or customer restrictions on Sheldon Pontiac; but there is a location restriction, as described in Section 5B of the Uniform Agreement.

5. Sheldon Pontiac's competitors consist generally of all car dealers marketing cars within the Pontiac price range. (Tr. 161). Intra-brand competition in the area exists with Armstrong (now French) Pontiac in South River, New Jersey (Armstrong Pontiac), Perrine's, Reydel in Edison, and Panter in Perth Amboy. (Tr. 160). Examples of inter-brand competition include the manufacturers of Chevrolet, Ford, Chrysler, and Plymouth automobiles. (Tr. 161).

6. Sheldon Pontiac and PMD do not compete with each other. (Tr. 164).

7. Sheldon Pontiac applied to PMD in writing when seeking to relocate its dealership. (Tr. 173, 190; Exs. P–42, P–43).

8. Approval of dealer's relocation applications must come initially from the Zone Manager in the area wherein the dealership is located, and then from Pontiac's Central Office, with concurrence of the Marketing Staff of General Motors Corporation. (Tr. 40–194, 195, 292).

9. Plaintiff sought initially to relocate to Route 18, East Brunswick, New Jersey, at either of two sites, each approximately the same distance from Armstrong Pontiac in South River, New Jersey. (Tr. 246). One site is presently occupied by Loehmann's Shopping Center; and the other is known as Middlesex Sheet Metal Company (Middlesex). The latter is less than 5 miles from Armstrong. (Tr. 35, 38, 54, 57, 244–46; Ex. P–66).

10. From 1965 until the summer of 1972, Sheldon Pontiac considered relocating its dealership to Route 1, Milltown Road, North Brunswick, New Jersey. In 1965 Sheldon Pontiac made written application therefor to PMD and on May 19, 1966 it obtained written approval. (Tr. 173–80). It arranged for an investment of $200,000, financing, and a sale-and-leaseback agreement with a Dr. Weisenfeld. (Tr. 183). It also made site improvements. (Tr. 179–80, 196). On March 16, 1971 it learned that a zoning variance it had sought had unacceptable restrictions (Tr. 187); however, its efforts continued. Meantime there were at least three negotiations for the sale of the Sheldon Pontiac dealership. (Tr. 206).

11. Sheldon Pontiac applied for and was granted various extensions to complete its Route 1 relocation, the last to September 1972. (Tr. 182). As late as the summer of 1972, it had asked defendant to furnish further assurances to its financial agent that it was approved by PMD for operation at the new Route 1 location. (Tr. 188).

12. At the same time Schiffman became interested in a Route 18 site in 1969; and he decided later to abandon the project on Route 1, Milltown Road, North Brunswick, because

> Route 18 had suddenly emerged as the top commercial location in Middlesex County. And I had been offered a profit on the U.S. 1 property and I felt that Route 18 would be a better location for the sale of new and used cars.

(Tr. 197, 6–10). For a time he worked on both as possible sites, although Schiffman told PMD's Zone Manager Lubot that Route 18 would be a better location because from the time he had purchased the U.S. 1 property, three new shopping centers had

been built on Route 18, and there was talk about opening the road to the Jersey shore which would make it a main artery and double the traffic count. (Tr. 197, 19–25). However, Lubot advised him he could not relocate to that site.

13. When plaintiff wrote on August 15, 1972, requesting relocation approval of its proposed Route 18 Middlesex site, it neither owned nor had an interest in the site. While plaintiff tendered in evidence a draft of contract, unexecuted and bearing a November 1972 date (Ex. P–48), no consideration was paid, and the document had no force and effect (Tr. 279). At this time, in August 1972, PMD's Ramsey said Sheldon Pontiac had to find another site (Ex. P–43), and McInally in a memorandum to the file disclosed that they would give Sheldon Pontiac's request consideration in the event a relocation were completed by Armstrong Pontiac (Ex. P–47). PMD made repeated offers to work with Sheldon Pontiac in an effort to find another site, but Sheldon Pontiac manifested a lack of interest in looking elsewhere.

14. PMD's attitude was not unreasonable. Thus, it did not refuse to consent to a relocation on Route 18 generally, and there was no substantial showing that plaintiff had tried and failed to find an available site on Route 18 equally as favorable from a business point of view. Instead, it was Sheldon Pontiac which acted arbitrarily insisting on one and only one site on Route 18 for purposes of this case. (Tr. 338–41).

15. PMD's rejection of the Middlesex relocation was founded upon proximity of the proposed site to Armstrong Pontiac's South River dealership, reducing the reach of PMD dealerships to the motoring public and adversely affecting PMD's representation in the geographic area among persons seeking to buy new automobiles or have Pontiac automobiles serviced. (Tr. 293).

16. Whereas Sheldon Pontiac did not formally request consideration of a selected Route 18 site until August 1972, Armstrong Pontiac initiated its request for approval of a relocation on Route 18 as early as June 1970. (Ex. P–35, P–36, P–49, and P–50).

Plaintiff was aware of Armstrong Pontiac's request. (Tr. 248–49, 176–77; Ex. P–71).

17. Armstrong Pontiac was experiencing difficulties in its Route 18, East Brunswick, relocation efforts while Sheldon Pontiac was engaged in its relocation program on Route 1 (Exs. P–49, P–71); by 1973 it had selected a prospective site a considerable distance from the Route 18 site that Sheldon Pontiac was seeking, so that PMD was prepared to approve their separate relocations on Route 18 so long as their moves could be coordinated. (Tr. 241). There was another prospective move of Armstrong Pontiac to Route 9 and Highway 516, 6.2 miles from Sheldon Pontiac's proposed Route 18 site, and Sheldon Pontiac's Route 18 application was also approved if coordinated therewith (Exs. P–66, P–67, P–68, and P–69). Both proposed coordinated moves failed when Armstrong Pontiac was unable to conclude its arrangements. (Ex. P–71).

18. Although Sheldon Pontiac adverts to Section 5B of the Uniform Agreement, which provides for 30 days' notice to dealers of the establishment of a new dealership site within five miles of their sites (Jt. Ex. 1), there is no evidence that any written notice was sent with respect to plaintiff's proposed move to Route 18. (Tr. 368, 7–8). However, as tending to show that Armstrong Pontiac knew about the proposed relocation of Sheldon Pontiac, Schiffman testified that Ramsey told him on three occasions that PMD would not allow the move to Route 18 because Armstrong Pontiac objected. (Tr. 7, 8, 23, 63, 233, 261, 267, 269–74). Ramsey was never called as a witness by either Sheldon Pontiac or PMD; nor was any other evidence offered to corroborate that aspect of Schiffman's testimony. I need not determine the credibility of Schiffman's testimony. Accordingly, I do not decide whether or not Armstrong Pontiac either knew about or objected to the proposed relocation of Sheldon Pontiac to Route 18 in East Brunswick. As will be hereinafter discussed, even accepting *arguendo* Schiffman's testimony, it is insufficient either alone or in conjunction with

other evidence to prove a conspiracy in restraint of trade.

Indeed, in a letter dated December 8, 1972, approving a new location of Armstrong Pontiac to a site on Route 18 near Ferry Road, Madison Township, New Jersey, McInally wrote to Ramsey requesting a notification to not only dealers in Section 16, but also the dealer located in Freehold, and said it would be appropriate to wait at least thirty days following the notification before approving the Armstrong Pontiac new location. (Ex. P–50).

Similarly, in a letter of October 29, 1973 to McInally from McCullough, Manager of Dealer Organization Department, Sales Section, in the Sales Section approval of Sheldon Pontiac's relocation to Highway 18 near its intersection with Edgeboro Road in East Brunswick, it was said:

> It is assumed that Pontiac will properly notify any of its surrounding dealers that fall within the 'intent' of subsection B of Section 5 of the Pontiac Dealer Sales and Service Agreement with regard to this proposed relocation.

The letter further recommended written notification be made to Armstrong Pontiac or its replacement in South River. (P–66; see also P–67; 69). However, there is nothing in the record to indicate that written notice was ever sent to Armstrong Pontiac. (Tr. 368, 7–8).

19. Although Sheldon Pontiac contends that PMD conspired with Armstrong Pontiac to prevent Sheldon Pontiac from relocating on Route 18, there is no evidence of conspiratorial conduct. All that Sheldon Pontiac adduced is the uncorroborated testimony of its President, Schiffman, that he was told by PMD's Zone Manager Ramsey the site was too close to Armstrong; and that Armstrong would and did object to Sheldon Pontiac's proposed move. (Tr. 63, 241, 260, 271).

20. Sheldon Schiffman knew that PMD would not approve a relocation of Sheldon Pontiac to Route 18 in East Brunswick, even if Armstrong Pontiac did not object to the proposed move. (Tr. 207–209; 214–15).

My conclusions of law follow in opinion form.

## CONCLUSIONS OF LAW

I. Conspiracy in Restraint of Trade

 Recognizing that it has the burden of proving a violation of the antitrust laws, *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 374 n. 5, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *De Filippo v. Ford Motor Co.,* 516 F.2d 1313, 1321 (3d Cir.1975); *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 849 (5th Cir.1975); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 694 (5th Cir.1975); *Golden v. Kentile Floors, Inc.,* 512 F.2d 838, 849 (5th Cir.1975), Sheldon Pontiac urges that it has demonstrated that PMD and others have conspired to restrain trade in violation of Section 1 of the Sherman Act. The record in this case, as hereinbefore detailed, indicates that the conspiracy claim must rise or fall on circumstantial evidence. Of course, a conspiracy in violation of the statue may be shown entirely by circumstantial evidence. See, e. g., *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1345 (3d Cir.1975). Indeed, a claimant in a Sherman Act case may prevail without producing an express agreement between the alleged conspirators. See *United States v. General Motors Corp.,* 384 U.S. 127, 142–42, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610 (1939). See also *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668 (9th Cir.1975); *Milgram v. Loew's, Inc.,* 192 F.2d 579, 583 (3d Cir.1951); *Harlem River Consumers Co-op., Inc. v. Associated Grocers of Harlem, Inc.,* 371 F.Supp. 701, 714 (S.D.N.Y.), *aff'd,* 493 F.2d 1352 (2d Cir.1974). Compare *Williams v. Independent News Co.,* 485 F.2d 1099 (3d Cir.1973).

 However, the mere production of *some* circumstantial evidence is often not enough to establish a conspiracy in restraint of trade. While an unlawful conspiracy may be shown by reference to circumstantial evidence, it has been said that "circumstantial evidence does not compel an inference of conspiracy. . . . " *Treasure*

*Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.,* 497 F.2d 203, 208 (9th Cir.1974). See also *Thomas v. Amerada Hess Corp.,* 393 F.Supp. 58, 71 (M.D.Pa.1975). In analyzing the sufficiency of such evidence required to prove a conspiracy, the Court of Appeals in this Circuit has recently noted:

[where] the circumstances are such as to warrant [the trier of fact] in finding that the [alleged] conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified.

*American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1243 (3d Cir.1975), quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

■ As hereinbefore indicated, Schiffman testified that Ramsey stated that PMD would not approve the move because Armstrong Pontiac had objected. That testimony, according to Sheldon Pontiac, demonstrates that PMD and Armstrong Pontiac conspired to restrain trade, namely, to prevent Sheldon Pontiac from relocating to Route 18, East Brunswick. Indeed, the record will reflect that, after all the evidence was in, Sheldon Pontiac does claim that only PMD and Armstrong Pontiac were members of the alleged conspiracy. As previously noted, I have not made a determination with respect to Schiffman's testimony. It and other evidence in the case do not prove a conspiracy in restraint of trade between PMD and Armstrong Pontiac. Schiffman's testimony, and the documents in support thereof, merely demonstrate that PMD was concerned about the views of its dealers whose rights under Section 5B of the Uniform Agreement might be affected by a relocation of a dealership. Certainly, such evidence does not demonstrate a conspiracy or combination in restraint of trade.

As will be more fully detailed hereinafter, Section 5B of the Uniform Agreement is merely a "location clause" which is not illegal *per se* under Section 1 of the Sherman Act. Thus, such an arrangement is not necessarily an express agreement in restraint of trade. Similarly, the fact that PMD might have contacted Armstrong Pontiac with respect to Sheldon Pontiac's proposed relocation to Route 18 in East Brunswick does not permit an inference of a conspiracy in restraint of trade. Since PMD was obviously aware of the Section 5B provision, it attempted to notify Armstrong Pontiac of the proposed relocation of Sheldon Pontiac. Such action is entirely consistent with the legality of Section 5B. While the provision obligates a dealer to obtain the approval of PMD before it relocates within 5 miles of another Pontiac dealer, Section 5B also protects the latter from diminution of the value of its franchise resulting from such a relocation. That PMD might have sought a waiver from Armstrong Pontiac merely indicates that PMD was attempting to make Armstrong Pontiac aware that its rights under the Uniform Agreement with PMD would be affected by Sheldon Pontiac's relocation to East Brunswick. Furthermore, that PMD declined to approve Sheldon Pontiac's relocation to Route 18 only suggests that PMD was exercising sound business judgment when faced with the prospect of having two dealers in close proximity to each other.

Accordingly, Sheldon Pontiac has not demonstrated that PMD engaged in a conspiracy in restraint of trade.

## II. Horizontal Territorial Restraint

Sheldon Pontiac has suggested during the course of this litigation that it has shown a conspiracy by PMD and others to establish a horizontal territorial restraint among Pontiac dealers. However, if it was demonstrated that an actual conspiracy to restrain trade was afoot, then Sheldon Pontiac would not have to further prove that the object of the conspiracy was to promote a restraint illegal *per se* under Section 1 of the Sherman Act. If Sheldon Pontiac tendered sufficient proof to establish a conspiracy in restraint of trade, it would not be required to show that the conspiracy was

designed to implement a particular type of *per se* restraint. Cf. *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1256 (2d Cir. 1975); *Williams v. Independent News Co.*, 485 F.2d at 1104. To be sure, Sheldon Pontiac would have been entitled to judgment in the event that it established damage to its business materially caused by, *Rea v. Ford Motor Co.*, 497 F.2d 577, 589 (3d Cir. 1974), "a classic combination in restraint of trade: joint, collaborative action . . . to eliminate a class of competitors . . . ." *United States v. General Motors Corp.*, 384 U.S. 127, 140, 86 S.Ct. 1321, 1327, 16 L.Ed.2d 415 (1966).

Conversely, Sheldon Pontiac's burden of proving a violation of Section 1 of the Sherman Act would be substantially reduced if it could be demonstrated that PMD engaged in a practice which was a *per se* violation of the statute. In that regard, it is appropriate to review certain well-recognized principles of antitrust law.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States". However, it has long been recognized that the provision has a narrower application because to some degree "[e]very agreement concerning trade, every regulation of trade, restrains." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) (emphasis added). Thus, "the courts have construed [Section 1 of the Sherman Act] as precluding only those contracts or combinations which 'unreasonably' restrain competition." *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

However, certain business practices are presumed to be "unreasonable", and, therefore, illegal *per se* under the statute. See, e. g., *De Filippo v. Ford Motor Co.*, 516 F.2d at 1317. This principle was succinctly summarized by Mr. Justice Black in *Northern Pacific Ry. v. United States*, 356 U.S. at 5, 78 S.Ct. at 518:

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. . . .

Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210 [60 S.Ct. 811, 838, 84 L.Ed. 1129]; division of markets, *United States v. Addyston Pipe & Steel Co.* [6 Cir.], 85 F. 271 [46 L.R.A. 122], affirmed 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, *Fashion Originators' Guild of America v. Federal Trade Comm'n*, 312 U.S. 457 [668, 61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangements, *International Salt Co. v. United States*, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20].

Noting the advantages of the *per se* doctrine, Sheldon Pontiac has strenuously urged throughout this litigation that Section 5B of the Uniform Agreement, as applied by PMD to the application for relocation to Route 18 in East Brunswick, constitutes a horizontal territorial restraint illegal *per se* under Section 1 of the Sherman Act. In support of this contention, Sheldon Pontiac relies principally upon the decision of the Supreme Court in *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

In *Topco*, certain independent supermarket chains formed a cooperative association to obtain merchandise under private labels, thereby enabling them to more effectively compete with larger chains. The member chains exercised tight control over the association: all stock was owned by the members; there were restrictions on the alienation of the stock; and the board of directors of the association was composed of ranking officers of the member chains.

Each member of the association signed an agreement binding it to sell Topco-brand products within a designated area. It was also agreed that products bearing the private label would not be sold by any member outside the area assigned to it in the agree-

ment. Additionally, those products could not be sold at wholesale by the member chains without obtaining permission from the association.

The Court held that, under the circumstances, the allocation of territories among members of the association constituted a horizontal restraint violative of Section 1 of the Sherman Act.

It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act. . . . One of the classic examples of a *per se* violation of § 1 is an *agreement between competitors at the same level of the market structure to allocate territories* in order to minimize competition. Such concerted action is usually termed a "horizontal" restraint, *in contradistinction to combinations of persons at different levels of the market structure, e. g., manufacturers and distributors, which are termed "vertical" restraints.* . . . We think that it is clear that the restraint in this case is a horizontal one, and, therefore, a *per se* violation of § 1. . . .

405 U.S. at 607–608, 92 S.Ct. at 1133 (emphasis added). The Court also condemned that part of the agreement which prohibited members from selling Topco-brand products at wholesale without permission of the association.

■ The record in the matter before me reveals an arrangement wholly unlike the relationship which was struck down in *Topco.* Here, as in the case of the association in *Topco,* PMD is both a party to the agreement at issue and above the level of competition occupied by the dealers. Beyond that, however, this court finds no analogue in *Topco.* Sheldon Pontiac concedes, as it must, that PMD was not formed by the dealers. PMD, a subdivision of General Motors Corporation, is not staffed with personnel from Pontiac dealerships. Although the association in *Topco* was not on the same competitive level as the member chains, the Court faced little difficulty in concluding that the territorial allocations were horizontally imposed since the associa-

tion was nothing more than the alter-ego of its members. PMD occupies no such position. Accordingly, no horizontal territorial restraint is presented by the facts of this case.

Notwithstanding, Sheldon Pontiac has suggested that the restriction embodied in Section 5B of the Uniform Agreement is horizontal in nature because there is evidence in the record to suggest that Armstrong Pontiac, a competitor of Sheldon Pontiac, was asked to waive any objection to the relocation, and declined to do so. Cf. *Sandura Co. v. F.T.C.,* 339 F.2d 847 (6th Cir. 1964). Schiffman testified that he was told by Ramsey of PMD that Armstrong objected to the proposed relocation of Sheldon Pontiac. However, even accepting that testimony *arguendo,* a horizontal territorial restraint is not made out. It is uncontested that Section 5B of the Uniform Agreement is imposed on the dealers by PMD; and the dealers do not own or control PMD. Therefore, the evidence is overwhelming that the restraint involved here was vertically imposed. That a representative of PMD may have asked a competitor of Sheldon Pontiac to waive objection to the proposed relocation did not change the essential relationship, under the Uniform Agreement, between PMD and the dealers.

Sheldon Pontiac has urged that the interpretation of Section 5B that requires PMD to notify a dealer within five miles of a proposed relocation is analogous to the radius letter policy condemned in *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 365 F.Supp. 1073 (D.N.J.1973), *aff'd in part, rev'd in part,* 521 F.2d 1230 (3d Cir. 1975). While the record before me indicates that PMD has engaged in the practice of notifying a dealer within five miles of a proposed relocation of another dealer, there is nothing before me to indicate that Armstrong Pontiac, the only dealer within the context of Section 5B which would object to the relocation of Sheldon Pontiac, received any sort of written communication. Additionally, I cannot conclude on what is before me that an objection by a dealer would be dispositive of an application for relocation

by another Pontiac dealer. It is clear that PMD could reject an application for relocation on the basis of what it perceives to be sound business judgment, albeit a dealer within five miles of a contemplated relocation did not raise an objection thereto. Compare 521 F.2d at 1243.

Furthermore, only a dealer who is within five miles of a proposed relocation may object to the move. Thus, the restriction embodied in Section 5B is carefully limited as to the area in which a dealer must reside in order to be permitted and entitled to object to a proposed relocation. Compare 365 F.Supp. at 1078–1079. Accordingly, I must conclude that Section 5B is not a horizontal territorial restraint illegal per se under *American Motor Inns, Inc.* See also *Kaiser v. General Motors Corp.,* 396 F.Supp. 33, 40–41 (E.D.Pa.1975), *aff'd without opinion,* 530 F.2d 964 (3d Cir. 1976).

### III. Vertical Territorial Restraint

This court's inquiry is not yet at an end, albeit Sheldon Pontiac has failed to prove a claim under a theory of common law conspiracy, on the one hand, or horizontal territorial restraint, on the other. While Sheldon Pontiac has not urged that a vertically imposed restraint is involved here, it is clear that Section 5B of the Uniform Agreement can only be so characterized. Thus, no resolution of this case would be complete without an analysis of its vertical aspects.

■ Unlike its horizontal counterpart, a vertical restraint does not always constitute a *per se* violation of Section 1 of the Sherman Act. In *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), the Supreme Court examined vertical territorial restraints for the first time. A manufacturer of trucks and its distributors agreed that the distributors would each be given an exclusive territory in which to sell the trucks, and that no trucks could be sold to customers having a place of business or purchasing agent located outside the assigned territories. The district court concluded that the arrangement constituted a *per se* violation of the Sherman Act, and, accordingly, granted summary judgment in favor of the government.

Reversing the determination below, the Supreme Court held:

Horizontal territorial limitations, like "[g]roup boycotts, or concerted refusals by traders to deal with other traders" (citation omitted), are naked restraints of trade with no purpose except stifling competition. A vertical territorial limitation may or may not have that purpose or effect. We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business (citations omitted) and within the "rule of reason". We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack . . . any redeeming value" (citation omitted) and therefore should be classified as *per se* violations of the Sherman Act.

Thus, in *White Motor Co.,* the Supreme Court rendered no definitive statement with respect to vertical territorial restraints.

However, in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Court expressed its views on the merits of vertical territorial restraints. There, the manufacturer had established franchised retailers who would sell its bicycles to the public. While the retailers were permitted to sell other brands of bicycles, and to set their own prices for Schwinn bicycles, they were prohibited from acting as wholesalers by selling Schwinn bicycles to non-franchised dealers. Above the retail level, the manufacturer maintained wholesale distributors to whom it sold its bicycles. The retailers obtained bicycles from wholesale distributors within their respective areas. Similarly, the wholesale distributors were required to sell Schwinn bicycles only to the fran-

chised retailers. Furthermore, the manufacturer prohibited its wholesale distributors from selling to franchised retailers located outside their assigned areas. The retailers could also obtain bicycles directly from the manufacturer under the so-called Schwinn Plan whereby bicycles were shipped directly from the manufacturer to the retailer with the wholesale distributor issuing the order. Thus, the Court was faced with a vertical arrangement involving the issue of

> the degree to which a manufacturer may not only select the customers to whom he will sell, but also allocate territories for resale and confine access to his product to selected, or franchised, retailers. . .

388 U.S. at 378, 87 S.Ct. at 1865.

In deciding whether or not to classify the vertical restraint presented in *Schwinn* as a species of business arrangement illegal *per se* under Section 1 of the Sherman Act, the Court distinguished "the situation where the manufacturer parts with title, dominion, or risk with respect to the article, and where he completely retains ownership and risk of loss." 388 U.S. at 378–379, 87 S.Ct. at 1865. That distinction determined, at least to some degree, the appropriate application of the *per se* rule:

> [W]here a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. . . . On the other hand, as indicated in *White Motor,* we are not prepared to introduce the inflexibility which a *per se* rule might bring if it were applied to prohibit all vertical restrictions of territory and all franchising, in the sense of designating specified distributors

and retailers as the chosen instruments through which the manufacturer, retaining ownership of the goods, will distribute them to the public. Such a rule might severely hamper smaller enterprises resorting ·to reasonable methods of meeting the competition of giants and of merchandising through independent dealers, and it might sharply accelerate the trend towards vertical integration of the distribution process. . . .

388 U.S. 379–80, 87 S.Ct. 1865. The aforementioned statements suggest that a mere vertical restraint contained in a contract would constitute a *per se* violation of Section 1 of the Sherman Act if it could be shown that the manufacturer parted with title or dominion over goods at the time of shipment to a wholesaler or distributor. However, the Court also observed that *Schwinn* had enforced the vertical restrictions at bar:

> In any event, it is clear and entirely consistent with the District Court's findings that Schwinn has been "firm and resolute" in insisting upon observance of territorial and customer limitations by its bicycle distributors and upon confining sales by franchised retailers to consumers, and that Schwinn's "firmness" in these respects was grounded upon the communicated danger of termination.

388 U.S. at 372, 87 S.Ct. at 1862.

Courts have generally refused to interpret Schwinn as condemning, without more, contract clauses containing vertically imposed territorial restrictions. Thus, it has been held that vertical territorial restrictions do not violate the *per se* rule unless the restriction is resolutely enforced by the manufacturer, *Redd v. Shell Oil Co.,* 524 F.2d 1054, 1058 (10th Cir. 1975); *Williams v. Independent News Co.,* 485 F.2d at 1111 (Adams, J., dissenting); *Janel Sales Corp. v. Lanvin Parfums, Inc.,* 396 F.2d 398 (2d Cir. 1968), or the restriction is necessary to safeguard the distribution of a potentially dangerous product, *Tripoli v. Wella Corp.,* 425 F.2d 932 (3d Cir. 1970). See generally *Copper Liquor, Inc. v. Adolph Coors Company,* 506 F.2d 934, 944–45 (5th Cir. 1975).

However, in the opinion of this court none of the above principles, distinguishing the applicability of the *per se* rule in *Schwinn,* are controlling with respect to the matter at bar. PMD has not argued that automobiles are of such a special nature as to require the protection of territorial restriction in their distribution and resale. Furthermore, in my view, the actual enforcement of a contract clause containing a vertical territorial restriction is not critical to an application of the *per se* rule enunciated in *Schwinn.* Obviously, a territorial restriction is inserted in a franchise contract by a manufacturer so that it may be enforced if the need therefor should arise. Since the restriction is part of the contract, the manufacturer will be in a position to enforce the provision and assert a legal right thereunder. Thus, it makes little difference that the restriction is firmly enforced or not. Undoubtedly, the manufacturer will invoke its rights under the provision when it is in the manufacturer's interest to do so.

Although the aforementioned exceptions to the *per se* rule are not applicable here, I am unable, nevertheless, to conclude that the vertical restriction contained in Section 5 of the Uniform Agreement is illegal *per se* under *Schwinn.* In that regard, I find controlling a recent analysis of *Schwinn* by the Ninth Circuit of the Court of Appeals. In *GTE Sylvania Inc. v. Continental T.V., Inc.,* 537 F.2d 980 (9th Cir. 1976), that Court refused to apply the *per se* rule of *Schwinn* to invalidate a "location" properly determined the legality of such provisions.

The Court in *GTE Sylvania* noted that in *Schwinn* the "territorial restrictions were tied to customer restrictions . . .." in the sense that wholesale distributors were prohibited from selling products to purchasers located outside the territory assigned to the wholesaler, whereas in *GTE Sylvania* the franchised dealers were free to sell to anyone:

> In marked contrast, Sylvania franchised at least two dealers in the major markets and each Sylvania dealer was *free to sell to any buyer he chose*—preserving intrabrand competition and allowing to every potential purchaser of Sylvania products a reasonable choice between several competing dealers.

*Id.* at 990. The court went on to note that "the facts in Schwinn make it clear that the territorial restraint which the Court condemned was a restraint that absolutely prohibited a dealer from selling to purchasers outside a certain area. . . ." *Id.* at 991.

Furthermore, the court noted that, as a matter of law, "location" clauses had been upheld by other courts which had found that the "rule of reason" applied to such provisions within the context of Section 1 of the Sherman Act. See, e. g., *Salco Corp. v. General Motors Corp.,* 517 F.2d 567 (10th Cir. 1975); *Kaiser v. General Motors Corp.,* 396 F.Supp. 33 (E.D.Pa.1975), *aff'd without opinion,* 530 F.2d 964 (3d Cir. 1976). The general legality of vertically imposed location clauses, according to the court, rested upon a variety of factors: an analysis of applicable case law revealed that a manufacturer could unilaterally enforce a location clause in a franchise agreement; the decree on remand in *Schwinn* upheld the validity of location clauses in contracts; and the Department of Justice declined to view location clauses as illegal *per se* after *Schwinn.* Furthermore, quite apart from validity of location clauses in light of *Schwinn,* the court concluded that a manufacturer's long-established right to grant "exclusive dealerships" would be severely undermined if location clauses were deemed illegal *per se* under Section 1 of the Sherman Act. In that regard, the court noted:

> The clearly established legality of exclusive dealerships logically compels the conclusion that location clauses cannot be *per se* illegal. If it is legal for a manufacturer to promise one dealer that he will have the exclusive right to sell the manufacturer's products within a designated territory, then obviously it is legal for that manufacturer to keep his promise of exclusivity by denying other dealers like Continental the power to sell from retail outlets at unauthorized locations within the first dealer's exclusive

territory. The accepted principle that a manufacturer may legally grant an exclusive dealership is rendered meaningless if he cannot legally use a location clause to prevent his other dealers from opening their own retail outlets in the same area. If a manufacturer cannot include a location restriction in a franchise agreement, he cannot do what the exclusive dealership cases hold is legal, i. e., promise that "I will not franchise another dealer in your area."

. . . . .

If we were to adopt the approach of *per se* illegality, the ultimate result might be to undermine franchising as a tool to enable the small, independent businessman to compete with the large vertically integrated giants of many industries. One danger would be that a single franchisee, allowed to expand into a chain of stores and sell everywhere over the manufacturer's objection and in violation of the contract, might make it impossible for other small single-outlet franchisees of the same manufacturer to compete effectively. Thus the loyal network of small independent businessmen that the manufacturer desired for his franchisees might be supplanted by several "giant" franchisees, each having numerous outlets. Another risk would be that a small manufacturer who could not afford to integrate vertically, if prohibited from offering any degree of territorial protection from intrabrand competition or "elbow room", might not be able to attract dealers and thus might be unable to establish an effective system of distribution for its product. We cannot believe that Congress intended to implement a rigid *per se* rule of illegality that portends such serious risk to franchising arrangements, methods that have been made significantly worthy contributions to our Nation's economy.

*GTE Sylvania Inc. v. Continental T.V., Inc.,* 537 F.2d at 997. It is also noted that a district court in this circuit has sustained the legality of "location clauses" under the antitrust laws. *Kaiser v. General Motors Corp.,* 396 F.Supp. at 40.

■ Section 5B of the Uniform Agreement before me is essentially a "location clause", and not a vertical territorial restraint. It expressly states that a dealer may not relocate within five miles of another Pontiac dealer without the consent of PMD: and it implicitly permits the latter to waive any objection it might have under the provision in the event that such a move is contemplated. Pontiac dealers are not restricted under Section 5B with respect either to whom they sell cars or where they may sell their cars. Compare *Noble v. McClatchy Newspapers,* 533 F.2d 1081, 1091 (9th Cir. 1976). They are not prohibited from advertising anywhere in the state; they may sell automobiles and provide services to all customers who come to their dealerships. Thus, Section 5B is a location provision which, standing alone, is entirely legal under *GTE Sylvania* and *Kaiser.*

Furthermore, the validity of Section 5B is not affected by the PMD's practice of notifying, or obtaining a waiver from, the dealer who is within five miles of a contemplated relocation. Obviously, the "location clause" inures to the potential benefit of all Pontiac dealers. I think that such a practice is entirely consistent with the legality of a "location clause" and essential to the healthy operation of the franchise system.

Sheldon Pontiac has suggested that, if this court does not view Section 5B of the Uniform Agreement as a *per se* violation of the Sherman Act, then the provision must be deemed to violate the "rule of reason" under that statute. In that regard, counsel for Sheldon Pontiac has urged that PMD must justify the restriction embodied in Section 5B under the "rule of reason". However, as hereinbefore indicated, the burden of proof is on the plaintiff to demonstrate a violation of the antitrust laws by PMD. The record will reflect that the plaintiff has tendered no proof that either Section 5B or the activity of PMD under the circumstances of this case was unreasonable under Section 1 of the Sherman Act.

Accordingly, judgment will be entered in favor of PMD in this action.

Counsel for PMD is directed to submit an appropriate form of judgment within five days.*

---

* Upon application of plaintiff, this trial was bifurcated, with liability being tried first. In view of the decision, no trial on damages is necessary.